Filed 12/16/15  In re D.C. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.C. et al., Persons Coming Under the Juvenile Court Law. | B263501<br>(Los Angeles County<br>Super. Ct. No. CK72059) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DESHAUN C.,<br><br>  Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn Kading Martinez, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Father Deshaun C. appeals from the court's order terminating his parental rights to his daughters, D.C. and R.C. He argues the court erred by denying him a contested hearing on the "beneficial parental relationship exception" (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)) to adoption.[1] We disagree and affirm.

## FACTS AND PROCEDURE

### 1. *The Children Are Removed from Mother and Placed with Father*

The children have had an unfortunately long history in the dependency system with numerous placements involved. This case started in October 2010, when the Los Angeles County Department of Children and Family Services (DCFS) filed a dependency petition based on a history of violent altercations between mother Nectarrinna C. and David W., who is the father of D.C. and R.C.'s half sister, I.W. The petition also alleged mother physically abused and neglected D.C. and R.C. At the time, D.C. and R.C. were five years old and three years old, respectively, and lived with mother and David W. The court detained the children from mother and released them to father's custody. Father had previously lived with the children and mother from the time of D.C.'s birth until he was incarcerated in 2008.

Through mediation, the parties agreed to submit to an amended petition and agreed on a disposition and case plan. Accordingly, in January 2011, mother pled no contest, and the court sustained allegations of the amended petition based on the conduct of mother and David W. The court placed D.C. and R.C. with father on the condition that he reside in paternal grandfather's home. It ordered family maintenance services for father and family reunification services for mother. Father had to participate in parenting classes and comply with his parole terms.

In April 2011, DCFS reported substantial "non-compliance" with the case plan and court orders by father. DCFS documented problems that began almost immediately after the jurisdiction/disposition hearing. Father was leaving the children with people

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

who refused to submit to a live scan or CLETS[2] search, had repeatedly failed to make them available for phone calls and visits with mother and their half sister I.W., failed to appear for scheduled visits by the social worker, and frequently had his phone turned off or did not return the social worker's calls. Paternal grandfather and paternal grandmother had each called the social worker with concerns. Paternal grandfather reported father was drinking alcohol in his bedroom, leaving the children for multiple days at a time with other people, cursing at his girlfriend in front of them, and "talk[ing] bad" to them. Paternal grandfather had ejected father from his home, and father and the children were staying with a friend. Paternal grandmother said that at one point, father had disappeared for seven days and she had the children for that time. She picked them up from father's friend, with whom he had left them. Father admitted that he was keeping the children out until 9:30 p.m. on school nights "due to his rap music." Besides failing to cooperate with sibling visits, father refused to let the children have pictures of their half sister when mother offered them at a visit. He told the social worker that he did not want "the girls around it/that." The social worker gave the children pictures of their half sister; the children reported that father threw them in the trash.

### 2. Father Absconds with the Children

On July 15, 2011, the social worker reported that she could not locate father and the children, and his compliance had become "non-existent." The social worker had last seen them on June 1, 2011, at the DCFS office. She had tried to contact father by phone numerous times in June with no success. She contacted mother, who believed the children were in San Bernardino, and father's girlfriend, who refused to disclose her and father's address. Further, although father reported that he enrolled D.C. in elementary school in February 2011, the social worker discovered in May 2011 that he never

---

[2] The California Law Enforcement Telecommunications System, which reports criminal history information. (*People v. Martinez* (2000) 22 Cal.4th 106, 113.)

3

enrolled her. DCFS was requesting a protective custody warrant (§ 340) for the children and an arrest warrant for father. The court ordered the warrants to issue.

For the next several months, the social worker followed leads on father's whereabouts but was unable to locate or contact him and the children. During this time, mother was able to get father on the phone three times. He said that he was keeping the children from her because she did not send him pictures of them and became pregnant with their half sister while he was incarcerated.

In January 2012, DCFS received notice that father, his girlfriend, and the children were at an address in Las Vegas, Nevada and were reportedly planning to leave for Texas imminently. Clark County Child Protective Services located the children, and shortly after, DCFS retrieved them from Las Vegas and placed them in a foster home in the Antelope Valley. The children reported that father and his girlfriend would "whoop" them with a belt "a lot." They did not attend school while with father. D.C. also reported that "her daddy was 'hiding secrets' and she couldn't say anything," and he said they could not live with mother "ever, ever again." The court detained the children and ordered that they have no contact with father's girlfriend.

After DCFS retrieved the children from Las Vegas, DCFS did not know father's whereabouts until he contacted the social worker in March 2012 and provided a Texas address.

### 3. The Children Are Placed Back with Mother

DCFS filed a subsequent petition[3] alleging father and his girlfriend physically abused the children by striking them with belts, and father failed to comply with court orders by intentionally concealing the children from DCFS and the court for six months and moving them out of state. In May 2012, the court sustained the subsequent petition

---

[3] "In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition." (§ 342.)

4

and terminated the home-of-father placement order. It ordered monitored visitation by a DCFS-approved monitor in the DCFS office and monitored phone contact for father, as well as reunification services.

In the six months after the children were detained from father, he had some monitored phone calls with the children, but he had not called "for awhile" because he had lost his phone. He did not visit in person until he appeared for a court hearing regarding their half sister in July 2012, and the court ordered DCFS to facilitate a same-day visit.

In September 2012, the court terminated the foster home placement and returned the children to the home of mother, along with their half sister I.W. and a new half sister born in July 2012, C.W.[4] The court retained jurisdiction over the children, however.

The court terminated father's reunification services at the six-month review hearing in November 2012. At that time, DCFS reported that it had been unable to contact father since June 2012 (except for the court appearance he made in July 2012). The social worker tried leaving messages on his cell phone, at his workplace in Texas, and with his relatives, all to no avail. As a result, the social worker could not report on whether father had pursued parenting classes and counseling. The visit in July 2012 was the only visit father and the children had since they were removed from his care in January 2012.

As of the March 2013 DCFS report, father had not had any further visits, and he still had not contacted the social worker. The children apparently had some phone contact with father, however, because they complained to the social worker that father had promised to send them Christmas presents but did not.

### 4. The Children Are Removed from Mother Again and Placed in Foster Care

In May 2013, the court detained the children and their two half sisters from mother's custody based on allegations that mother and David W. had engaged in violent

---

[4] David W. fathered C.W.

altercations, mother was using methamphetamine, she hit D.C. in the face with a shoe, and a pipe with a usable amount of methamphetamine had been accessible to the children.

During the investigation into the new allegations, DCFS discovered that father had returned to California in April 2013 and was having unmonitored contact with the children. R.C. told the social worker she had a visit with father "[t]hat was nice." Father had the children for a weekend right before they were removed from mother, and he had also spent three nights at mother's house with the children. After the social worker contacted father and interviewed him regarding the latest allegations, he had three monitored visits in June 2013. The children were reportedly happy to see him and there were no issues. The children were currently in a foster home, but they said they wanted to live with father because "he does not hit them as much," and they believed mother and David W. were still together and would continue to fight "all the time."

In July 2013, the court sustained an amended subsequent petition that added the new allegations against mother and David W. to the older counts regarding father and his girlfriend physically abusing the children and father intentionally concealing the children from DCFS. The court ordered DCFS to suitably place the children outside the parents' custody and ordered reunification services for mother.

During the following six-month period, father visited on "an irregular basis" and "ha[d] not been consistent at all," though the visits usually went well and the children were happy to see him.

Shortly after the January 2014 review hearing, DCFS placed R.C. in the home of Crystal H., father's close friend.[5] D.C. remained in the foster home apart from R.C. D.C. reported to the foster mother and the social worker that she believed R.C. was

---

[5] Father said Crystal H. was akin to a sister. Crystal H. described the children as her nieces.

dangerous because she hit and bullied D.C. Even though D.C. was the older child, the social worker described R.C. as the "stronger personality."

**5. *The Court Sets the Matter for Permanency Planning, Which It Continues Several Times***

In February 2014, the court terminated mother's reunification services and set the matter for a permanency planning hearing. The court ordered that DCFS look into placing D.C. and R.C. together in Crystal H.'s home. Through the social worker's investigation on this issue, she discovered that father had unmonitored contact with R.C. recently. Crystal H. allowed father to visit R.C. at the park and attend her cheerleading practice, which violated the court's order that father's visits be monitored at the DCFS office by a DCFS-approved monitor. Father talked to R.C. on the phone when she was misbehaving to convince her to cooperate with Crystal H.

In April 2014, the court ordered both children placed in Crystal H.'s home. The court reiterated that father's monitored visits should take place in the DCFS office.

In preparation for the June 2014 permanency planning hearing (the first of a series of continued hearings), DCFS reported that the children had been in eight different placements by that point. Father's visitation continued to be irregular and inconsistent. At the scheduled hearing, father's counsel indicated father had not been able to visit the children. The court determined that Crystal H. could monitor father's visits in a public setting. It ordered father to confirm his visits 24-hours in advance. It also ordered DCFS to discuss permanency options with Crystal H. and continued the matter.

By August 2014, father still had not visited the children. He said Crystal H. was "keeping the children from him." Crystal H. reported that he never scheduled visits but rather called and demanded to see the children at that moment. He would then become upset when she could not arrange a visit at a moment's notice. By September 2014, Crystal H. was no longer comfortable monitoring visits because father "did not listen to the rules and he kept bringing his girlfriend" to visits.

Father was incarcerated in October 2014 and sentenced to 486 days. He protested to the social worker that Crystal H. was not answering his phone calls. Crystal H. did not

answer the calls because she did not have money on her calling card, and she did not feel she should have to pay for his call when he would only talk to the children briefly and spend the remainder of the call asking about his girlfriend. She heard from paternal grandmother that father used the money on his calling card to call his girlfriend, not the children. DCFS scheduled two phone calls between father and the children, but he missed those because of issues at the jail. He successfully called in for a third scheduled call in November 2014.

At the continued permanency planning hearing in November 2014, mother's counsel wanted to set the matter for a contest. When asked for an offer of proof, mother's counsel replied that the evidence would show the children "would suffer greatly if they cannot see mother and father again," that mother had an "ongoing relationship with these children," "that they would be suffering if they could not have a continued relationship with their mother," and the children were "strongly bonded to the mother." The court denied the request, stating: "Other than hearing a bald statement about a relationship and loving and missing, I don't have any evidence to support that, and I do not find the offer of proof sufficient to set the matter for a contest . . . ." Father's counsel then requested a contest also and "join[ed] in all of those statements" by mother's counsel. The court also denied father's request: "I find that [father's] offer of proof, like [mother's], is insufficient to persuade the court that if the matter were set for a contested .26 hearing that the court would reasonably likely be persuaded that it would be detrimental to terminate parental rights. Basically all I heard is that there's some bald, unsupported statement that there is a bond."

At the same hearing, Crystal H. indicated father had not been consistent in his phone calls. She reiterated her concern that she was no longer comfortable monitoring visits. The court ordered any visits to be monitored in the DCFS office.

By December 2014, father had been released from incarceration and could visit the children at the DCFS office. In December 2014 and January 2015, father had five visits scheduled. The first two in December occurred with no concerns reported. Crystal H. and the children did not show up for the third and fourth visits in December

8

and January, respectively. Father was quite late for the fifth visit in January because of transportation issues, and the children had already left by the time he arrived. Crystal H. and the children's therapist reported that the children were having difficulties since starting visits again, especially R.C. While very happy during visits, R.C. was moody, irritable, sensitive, and often cried afterward. Otherwise, their therapist said, they had shown many improvements in the last two months. Both children reported that they liked visiting with the parents, but R.C. was "sometimes" sad because she could not stay with them, and D.C. was "kinda" sad because she did not get to see them all the time.

At the next permanency planning hearing in February 2015, father renewed his request for a contest on the matter based on the latest visits and the comments that the children were happy to visit and were "sometimes" or "kinda" sad they could not spend more time with him. The court again denied the request. The children's counsel requested that visits be limited to one per month because the difficulties they experienced after visits were detrimental. The court agreed and limited father's visits to one per month.

DCFS finally approved Crystal H.'s adoption home study in March 2015, when the court held the final permanency planning hearing. Father had not visited the children since December 2014. The children and Crystal H. appeared for the monthly visit in February, but father did not. Crystal H. had a parent-teacher conference on the date scheduled for March's visit. She attempted to contact father about rescheduling and was unable to reach him. Father again renewed his request for a contested hearing based on the "parent-child bond," and the court again denied it. The court found the children to be adoptable and "clearly very well cared for by Ms. [H.]," with whom they had lived "for a substantial period of time," and terminated parental rights. After conferring with Crystal H., the children's counsel recommended that the monthly visits continue for the time being, and the court so ordered.

9

## DISCUSSION

Father maintains the court erred in denying his request for a contested hearing on the beneficial parental relationship exception to termination of parental rights. We reject this argument.

Once the court terminates reunification services, the focus of the case shifts from reunification of the family to the needs of the child for permanency and stability. (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) At the permanency planning hearing, the court has four choices, in order of preference: "(1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) . . . 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*Id.* at p. 53, citations omitted.) "Because a parent's claim to . . . an exception [to termination of parental rights] is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

The beneficial parental relationship exception to adoption exists when "[t]he court finds a compelling reason for determining that termination [of parental rights] would be detrimental to the child" because (1) "[t]he parents have maintained regular visitation and contact with the child," *and* (2) "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parents have the burden of establishing the predicate facts to the exception. (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1120.) Sporadic visitation does not satisfy the first prong of the exception requiring regular visitation and contact. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) Further, a showing that the child would merely derive *some* benefit from continuing a relationship with the parent through visitation is not enough to derail an adoption. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) The exception is not "a mechanism for the parent to escape the consequences of having failed to reunify." (*Ibid.*) "Satisfying the second

10

prong requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.'" (*In re Marcelo B., supra*¸ at p. 643.) The parent must show he or she is more than a "'friendly visitor or friendly nonparent relative.'" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

"[A] parent has a right to 'due process' at the hearing under section 366.26 which results in the actual termination of parental rights." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816.) But "[d]ue process is a flexible concept which depends upon the circumstances and a balancing of various factors." (*Id.* at p. 817.) It "does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest." (*In re Tamika T., supra*, 97 Cal.App.4th at p. 1122.) "[T]he court can require an offer of proof to insure that before limited judicial and attorney resources are committed to a hearing on the issue, [the parent] ha[s] evidence of significant probative value." (*Ibid.*) The court has discretion to "determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses." (*Ibid.*) Thus, "it does not violate due process for a trial court to require an offer of proof before conducting a contested hearing on one of the statutory exceptions to termination of parental rights." (*Ibid.*) "A proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact. The offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued." (*Id.* at p. 1124.)

We review the court's decision whether to grant a contested hearing for abuse of discretion. (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 758-759 (*Ingrid E.*).) The court did not abuse its discretion here. The first time father requested a contest, he joined in mother's statements that the children were bonded to mother, she had an ongoing relationship with them, and they would "suffer greatly" if they could not see the parents. This was hardly a "specific" offer of proof "setting forth the actual evidence to be produced" (*In re Tamika T., supra*, 97 Cal.App.4th at p. 1124), and was more a

11

statement of the issue (the parent-child bond) to be addressed. Moreover, even if father's offer of proof was more specific, it went to the second prong of the exception—that is, the "benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The offer of proof did not indicate father would provide evidence regarding the visitation prong different from what was in the DCFS reports. And the evidence from the DCFS reports was that father's visitation was inconsistent and sporadic, far from the regular visitation and contact necessary for the exception to adoption to apply. DCFS originally removed the children from mother's custody in October 2010, and the court terminated parental rights in March 2015. The children lived with father from October 2010 to January 2012, when DCFS located him and the children in Las Vegas after he absconded with them for approximately six months. From January 2012 on, the children lived with either mother or foster caregivers. Father had some monitored phone calls but did not visit them until July 2012, when he appeared for a court hearing. Though father had some phone contact around the holidays, he did not visit the children again until around April 2013, which were unmonitored visits in violation of the court's order, and then three visits in June 2013. From that point to November 2014 (when he first requested the contested hearing), father visited irregularly and rarely. He had one unmonitored visit with R.C. at the park. The court permitted Crystal H. to be a monitor as of June 2014, but required father to confirm his visits at least 24 hours in advance. He had not had any visits because he would call and want to see the children immediately, and Crystal H. could not arrange visits at a moment's notice. He was then incarcerated in October 2014, but had one phone call with them in November 2014. Between that time and termination of parental rights in March 2015, he visited them twice in December 2014. In sum, from 2012 to 2015, father went long stretches without visiting the children, and his visitation and contact with the children were inconsistent and sporadic at best. His offer of proof did not suggest he had evidence to contest this record.

Father's only other offer of proof came with his second request for a contested hearing, when he offered that the children were happy to see him and said they were "sometimes" or "kinda" sad they could not spend more time with him. This does not

12

suggest there was "'a *substantial*, positive emotional attachment such that the child[ren] would be *greatly* harmed'" by severance. (*In re Marcelo B., supra*, 209 Cal.App.4th at p. 643.) The children might have said the same thing about a friendly visitor or nonparent relative. In light of this record, there was no miscarriage of justice in the court's conclusion that father's offers of proof were insufficient to set a contested hearing.

*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138 is instructive. In that case, the mother asked the juvenile court to set a contested review hearing on her request to have her children returned to her custody. (*Id.* at p. 1142.) The mother's counsel represented that, at an evidentiary hearing, the mother would dispute the statements in the social worker's reports characterizing the quality of her visits and would show she had recently purchased a car, which meant she would visit the children more in the future. (*Ibid.*) The court declined to hold a contested review hearing and instead scheduled a permanency planning hearing, and the appellate court upheld that decision. (*Id.* at pp. 1142, 1148.) The appellate court held that even if she could have substantiated her offer of proof at a contested hearing, this was insufficient to show returning the children to her care was in their best interests. (*Id.* at p. 1147.) The mother did not represent that she would challenge the reports on the infrequency of her visits, and evidence of her intent to visit more frequently in the future was not sufficient to return the children at the time of the review hearing. (*Id.* at pp. 1147-1148.) Similarly, here, even if the children were sad they could not spend more time with father, this was an insufficient basis for the exception to adoption, which required regular visitation and contact and a substantial, positive emotional attachment such that the children would be greatly harmed by its severance.

Father cites *Ingrid E.* to support his argument. The *Ingrid E.* court held the juvenile court abused its discretion in denying the mother a contested 18-month review hearing, but this case is distinguishable. (*Ingrid E., supra*, 75 Cal.App.4th at p. 753.) First, the mother's offer of proof was much more robust than what father offered here. The mother represented that she would call her therapist, who would recommend

13

reunification, testify she was capable of parenting the children, and express disagreement with a psychological evaluation of her; would cross-examine the social worker and the psychologist and show that the psychological evaluation of the mother was based on outdated information; and would testify herself and show she had complied with her reunification plan. (*Id.* at pp. 753-754.) Second, the burden at the review hearing was on DCFS to establish that returning the children to the mother's custody would be detrimental, otherwise the court had to return the children to her. Even if the mother "had little or no evidence to proffer on her own behalf, she expressed a desire to cross-examine those witnesses—the social worker and the psychologist—on whose reports [the Department of Health and Human Services] had based its recommendations." (*Id.* at p. 759.) In contrast, here, father carried the burden of proving the exception to adoption applied including an offer of proof, and he did not express a desire to cross-examine the social workers about their reports.

## DISPOSITION

The order is affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.